**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

*******************************************
**UNITED STATES OF AMERICA**

**Criminal No. 12-CR-579 (TJM)**

**v.**

**GLENN R. UNGER,**
**Defendant.**
********************************************

**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REVIEW AND REVOCATION OF ORDER SETTING CONDITIONS OF RELEASE FOR DEFENDANT**

## I. Procedural Background

On December 17, 2012, United States Magistrate Judge Randolph F. Treece authorized the filing of an arrest warrant and complaint charging Glenn R. Unger (the "defendant") with false claims, in violation of Title 18, United States Code, Section 287.

On December 19, 2012, United States Magistrate Judge Randolph F. Treece authorized the execution of a search warrant at a storage unit located in Castleton, New York that was being rented by the defendant and the warrant was executed the same day.

On December 19, 2012, a federal grand jury in the Northern District of New York issued a seven-count indictment charging the defendant with the following offenses: attempt to evade or defeat tax, in violation of Title 26, United States Code, Section 7201; impeding the Internal

Revenue Service, in violation of Title 26, United States Code, Section 7212; false claims, in violation of Title 18, United States Code, Section 287; and false obligations, in violation of Title 18, United States Code, Section 514 (a)(2). On that same day, United States Magistrate Judge David E. Peebles authorized the filing of the indictment along with an arrest warrant for the defendant.

On December 28, 2012, United States Magistrate Judge Randolph F. Treece authorized the execution of a search warrant at the defendant's residence located at 10097 State Highway 37, Ogdensburg, New York.

On December 29, 2012, the defendant was arrested in Ogdensburg, New York pursuant to a warrant issued in connection with the above-described indictment. The following day (December 30, 2012) the defendant was brought before United States Magistrate Judge Randolph F. Treece for his initial appearance. The defendant was then detained and the matter was adjourned until January 2, 2013, for the arraignment and detention hearing.

On January 2, 2013, the defendant was arraigned in Albany by United States Magistrate Judge Randolph F. Treece. During the arraignment, the defendant appeared without counsel and stated that he did not wish to retain or request counsel at this time. Prior to the arraignment, a U.S. Probation Officer attempted to interview the defendant. However, the defendant refused to answer the probation officer's questions. Thereafter, the probation officer submitted a pretrial services report recommending the detention of the defendant. Following the arraignment, the government moved for detention on the grounds that the defendant was both a risk of flight and a danger to the community. The government advised the court that there was neither a

presumption of detention nor a statutory mandatory minimum sentence that applied in this case.[1] During the detention hearing, the defendant represented himself and responded to the government's detention arguments. At the conclusion of the detention hearing, Judge Treece stated that the defendant would continue to be detained until he posted real property as security. The Court then adjourned the proceedings to allow the defendant to post real property to secure his release. A copy of the detention hearing transcript is attached as "**Exhibit A**." Below is an excerpt from the conclusion of that proceeding:

> **THE DEFENDANT:** I do understand. I do understand.
>
> **THE COURT:** But this is not a negotiation at this point in time, sir. I've heard from ya and now the Government has moved to detain you, basically saying you're a risk of flight. I do believe conditions could be set. I want real property as security. Without it, I don't feel secure.
>
> **THE DEFENDANT:** But the issue you raised a moment ago about if the Court doesn't have jurisdiction to set –
>
> **THE COURT:** No, I was basically playing you with as you're playing with me now.
>
> **THE DEFENDANT:** No, I'm not playing you with at all. This is the rest of my life.
>
> **THE COURT:** Well, then, I was playing with you, I wasn't being honest. Here's the deal, I'm only going to repeat it once: I'm going to give conditions of release only if you can give me real property that will give me security that you will appear each and every time required. So, essentially, I'm denying Mr. Reynolds' motion to detain you, but I still find that you're a risk of flight, enough that I need security. That's it. And until I get the security, I'm giving you an opportunity to pitch to me as to what that value may be, then we'll have a discussion of whether or not I'll set bond at 100,000, 200,000, 300,000 or maybe even less than that. So, at this point, I will adjourn and give you an opportunity, sir, to consult with family or friends with regards to that. I will hear from you again when we can proceed and whether or not I am actually gonna issue an order of detention because you're not able to meet the conditions I'm setting or maybe I'll set some conditions. I mean, I'm tryin' to be as fair to you as I possibly can.

[1] Count 7 of the indictment carries the highest statutory maximum sentence and that is 20 years imprisonment.

**THE DEFENDANT:** If there isn't adequate authority to issue an order of detention, what am I being -- how am I being detained?

**THE COURT:** Well, I think I have authority.

**THE DEFENDANT:** In what way? And I'm not tryin' to argue. I need to understand.

**THE COURT:** I'm not gonna debate this with ya.

**THE DEFENDANT:** So we can't cite a particular venue of law that I'm under right now.

**THE COURT:** I don't have to cite the law.

**THE DEFENDANT:** So I don't have access to know which law –

**THE COURT:** No, you have access; when you go back to the jail, you can look it up where I have authority. But I don't have to cite it now. I'm not gonna play this game anymore. I mean, you presented yourself as a reasonable, personal person, you laid out all this, and then all of a sudden you get into this discussion with regards to my jurisdiction. Well, my jurisdiction is this: I'm prepared to set conditions of release, it's gonna be secured by property; if not, you're remanded back to the jail. And all you have to do is let Mr. Lamora know when you have reached somebody to have this discussion and I will put this matter on immediately to hear from you as to what you wish to proffer to the Court as security. And if I don't hear from you, I'm gonna issue an order of detention because I find you to be a risk of flight.

**THE DEFENDANT:** Is that risk based upon anything in particular?

**THE COURT:** Well, sir, we've been on this for an hour. I think I identified what the risk of flight is. Sir, we are also gonna give you a copy of the criminal pretrial order since you are representing yourself. Mr. Reynolds, do you have a copy of the criminal pretrial order?

**MR. REYNOLDS:** I do now, I believe.

**THE COURT:** All right. Sir, I am gonna remand you to the custody of the U.S. Marshal. I'll wait to hear from you. If I do not hear from you within the next day or so, then I will issue an order.

**THE DEFENDANT:** It may take more than a day, especially at county; it may take a few days. In fact, the party that I have in mind, I'm not exactly sure how to contact, it may take a few days to do that.

**THE COURT:** All right. I will take that all into consideration.

**THE DEFENDANT:** Yep, all right.

**MR. REYNOLDS:** Thank you, your Honor.

**THE COURT:** Mr. Reynolds, anything else that you wish to be heard on?

**MR. REYNOLDS:** No, I'm all set. Thank you, your Honor. Thank you for your time.

**THE COURT:** Okay.

(This matter adjourned at 3:28 PM.)

*See* Exhibit A, page 53, line 8, through page 56, line 18.

On January 9, 2013 (one week later), the Court conducted a continuation of the detention hearing to determine if the defendant was ready to post property for the bond. During the hearing, Judge Treece read the pre-trial conditions of release to the defendant. After reading the conditions to the defendant, he refused to tell the Court where he would be living upon release and also declined to sign the conditions. The defendant further stated that he didn't have his reading glasses and that he would review the conditions when he returned to jail. During the hearing, the defendant informed the Court that his sister would be posting her condominium in Boca Raton, Florida to secure his release on bond. A copy of the docket text entry for this proceeding is attached as "**Exhibit B**."

## II. <u>The Detention Hearing</u>

On January 2, 2013, in support of its position for the defendant's detention, the government presented evidence relating to the factors the Court must consider pursuant to Title 18, United States Code, Section 3142(g). The government submitted, in sum and substance, the following arguments in support of the defendant's detention.

### 1) The Nature and Circumstances of the Offenses Charged

In April 2010, the Federal Bureau of Investigation (FBI) interviewed the defendant regarding letters that he and his sovereign citizen affiliates had mailed to several state governors.

The letters to the governors stated that the governors would be "removed" and the FBI perceived that as a possible threat. On April 5, 2010, the FBI interviewed the defendant and the defendant stated that his real name was "Sam Kennedy." The defendant stated that Glenn Unger was his "de facto name." According to the defendant, the use of the name Glenn Unger purportedly formed a "contract" under which the user agreed to follow the rules of the "de facto government." Additionally, the defendant made several arguments to the FBI agent that have no basis in law, mostly involving the claim that the government does not have legitimacy.

Also in 2010, the Internal Revenue Service-Criminal Investigations Division (IRS-CID) initiated an investigation into the defendant based on a referral from the IRS Civil Collection unit. The Civil Collection unit is a division within the Internal Revenue Service ("IRS") whose primary function is to identify and detect taxpayers whose taxes have not been paid or have not been filed. Included within these responsibilities is the identification of taxpayers who show a pattern of willful failure to file or avoidance of paying income tax. Information collected by Civil Collection regarding the willful failure to file income tax returns by the defendant indicate that he has failed to file required personal income tax returns since at least 1999.

Since 2010, both the FBI and IRS have been conducting a joint investigation of the defendant and the investigation has revealed the following.

**COUNT 7**

From 1998 through at least 2006, the defendant owned and operated Columbia County Orthodontics ("CCO") located Chatham, New York. Around 2006, the defendant closed CCO and began renting a storage unit in Castleton, New York. When the defendant closed CCO, he transferred his patients to another orthodontist with initials WO and agreed to pay WO $200,000.00. The defendant gave WO a bonded promissory note in the amount of $200,000.00

as payment. After receiving the note, WO attempted to cash it at his bank and realized that it was fraudulent. Thereafter, WO hired an attorney and attempted to sue the defendant, but was unable to locate the defendant to serve him with the paperwork. The foregoing criminal conduct relates to Count 7 of the indictment.

**COUNT 6**

The investigation has revealed that the defendant did not file 1040 tax returns for tax years 2001-2003 and that he filed fraudulent and frivolous 1040 returns for tax years 2004-2008.[2] Based upon an examination of the defendant's CCO records, agents were able to determine that he received substantial income from his patients during tax years 1998-2006 thereby requiring the defendant to file a 1040 return for each tax year.

Additionally, the IRS, through its third party information reporting system, has received information that the defendant received taxable distributions from his retirement accounts and interest income for the years 2005 through 2009. A search of the IRS database revealed that the defendant received reportable income from investment accounts, such as IRA income, interest income, and early distribution pension income. Specifically, the defendant received approximately $141,918.00 in reportable transactions for tax year 2004, and approximately $123,555.00 in reportable transactions for tax year 2005 from Scott Trade, Inc. and MBNA American Bank. Additionally, the defendant received reportable investment income from Scott Trade during tax years 2006-2009 totaling approximately $125,377.00. In addition to the foregoing income, the defendant received reportable interest income from Seacomm Federal Credit Union totaling approximately $164.00 for tax year 2006, and approximately $212.00 for

[2] Unger filed four applications for extensions of time to file1040 tax returns for tax years 2001-2004.

tax year 2007.

All of the above income was not reported to the IRS by the defendant. On August 4, 2009, the IRS filed a tax lien in Saratoga County against the defendant in the amount of $116,410.00. The lien was for the defendant's failure to pay income taxes and also included penalties for frivolous IRS filings. On June 17, 2011, the defendant attempted to file a document at the Saratoga County Clerk's Office that falsely indicated that he had paid the federal tax lien. The foregoing criminal conduct relates to Count 6 of the indictment.

**COUNTS 1-5**

After closing CCO in 2006, the defendant began throughout the country conducting paid seminars and internet radio broadcasts in Albany and throughout the country, teaching the following two financial schemes: (1) a 1099-OID scheme; and (2) how to defraud others into accepting false security instruments as payment of debt. According to the defendant's teachings, if a taxpayer were to follow the scheme he promoted, then the taxpayer would be issued a refund from the IRS to which they were not legally entitled. The investigation has revealed that the defendant has taken steps to hide his true identity by conducting these seminars under the name "Dr. Sam Kennedy."

In 2007, the defendant began filing bogus tax returns utilizing the 1099-OID scheme that he taught at his seminars in attempt to cause the IRS to send him a tax refund. Between 2007 and 2011, the defendant filed thirteen false and fraudulent claims with the IRS seeking refunds totaling approximately 36 million dollars. Luckily, the IRS discovered that the forms were fraudulent before issuing any refunds to the defendant. The foregoing criminal conduct relates to Counts 1-5 of the indictment.

**2) The Weight of the Evidence Against the Defendant**

The defendant has a history of membership with tax defier groups and taught seminars on how to falsify tax returns and how to use fraud to relieve debts. The defendant did not file any tax returns for tax years 1999-2006 reporting income from CCO, his orthodontic practice. Although the defendant is not charged with tax evasion regarding his orthodontic income, billing and bank records confirm that he had substantial reportable income during that time.

The defendant practiced the schemes he taught on both the IRS and the orthodontist named WO. This is corroborated by the fact that the same documents (the bonded promissory notes and 1099-OID's) that the defendant used to defraud were handed out by the defendant to seminar attendees. The FBI and IRS have obtained copies of these documents. The defendant used his name, Glenn Unger, address, and his social security number on all of the forms he filed with the IRS attempting to obtain a refund. In the event that a refund check had been issued and mailed, the check would have been payable to Glenn R. Unger and mailed to the defendant at his address. Therefore, the evidence shows that the defendant would have been the person that would have benefitted financially from this scheme to defraud.

There is reliable direct evidence through the IRS third party reporting system which clearly shows that the defendant failed to report income to the IRS. The defendant attempted to file a document at the Saratoga County Clerk's Office that falsely indicated that he had paid the federal tax lien. Further, even after the defendant received several notices from the IRS stating that his claims were frivolous, he continued to file frivolous returns and also continued to counsel the others to do the same.

On December 30, 2012, agents executed a search warrant at the defendant's residence in Ogdensburg and located, among other things, sixteen boxes of sovereign citizen literature.

Therefore, the weight of the evidence is strong and the likelihood of conviction is high.

**3) The History and Characteristics of the Defendant**

Since the defendant refused to be interviewed by probation, the Court does not have much information. The defendant was an orthodontist before conducting paid seminars and internet radio broadcasts. The investigation has revealed that the defendant has been linked to several anti-government and anti-tax ideology groups. The defendant has been described as one of the "elders" of the group. The defendant does not believe that the government is legitimate and does not recognize the Court's authority or jurisdiction over him. The defendant has a valid New York State pistol permit and possessed loaded firearms at his residence, including three assault rifles with large capacity magazines. The defendant's medical license is inactive and he has been prescribing hydrocodone to individuals without a license in violation of state and federal law. This is the defendant's first arrest so he has no known criminal history.

**4) The Nature and Seriousness of Danger to the Community if the Defendant is Released**

On December 19, 2012, a federal search warrant was issued at Reliable Storage, 950 Route 9, Castleton, New York for unit number 308 rented by the defendant. Inside unit 308, agents located, among other things, internet printouts dated between 1996 and 2006 regarding fuses, pyrotechnics, armor piercing ammunition, grenade launching devices, trip wire switches, radio controlled detonation, chlorine bombs, pipe bombs, envelope bombs, glycerin, homemade silencers and money laundering.

On December 30, 2012, agents executed a federal search warrant at the defendant's residence in Ogdensburg. Inside the residence, agents located 9 firearms. Six of the nine firearms were handguns that were listed on his pistol permit. The remaining three firearms were assault rifles with large capacity magazines. Several of the firearms were loaded, including a

handgun under the defendant's mattress.

After his arrest, the defendant stated to the FBI that "he was the most wanted man in the country because he has done more to affect commerce in this country than anyone else." The defendant also stated that he "would rather die than be subject to the government."

The possession of assault rifles combined with anti-government beliefs is a dangerous combination alone. The possession of firearms by a person that believes he is wanted by the government is an even greater danger. Especially, given the fact that the defendant told agents that he would rather die than be subject to the government. According to one witness, the defendant does not "play by the rules" and on multiple occasions told her that "if the police came to his door, he would be prepared." This same witness also stated that the defendant owned firearms and was a member of the "Patriot Movement."

During the detention hearing on January 2, 2013, the defendant provided the court with the following explanation regarding the firearms in his residence:

> **THE DEFENDANT**: ...It is clear to me that there's no ego involved in being the most wanted man as an anchor on Restore America Plan. I'm well aware of the risks that were undertaken. The other reason for having a loaded firearm under the gun(sic) is, I hate to put this on the record, but I have to –
>
> **THE COURT:** Well, if you hate to, I wouldn't then.
>
> **THE DEFENDANT:** Well, I have to in this circumstance, is that I was directly threatened if I did one more radio program, by a member of military intelligence who used to be the head of the airbase in El Toro, California, that there wouldn't be a grease spot left where I stood or my family stood. Very sensitive information. And if you look in my eyes, you can see that I speak the truth. I am not saying anything here to get my neck out of the noose. And why is that? Because, Judge, you don't come bearing truth without understanding the risks in a system of incorporated inferior jurisdiction.

*See* Exhibit A, page 34, lines 9-25.

The defendant's anti-government teachings have resulted in several individuals being

indicted in federal courts across the country. These defendants are individuals that attended the defendant's seminar. Thereafter, they followed his instructions and advice which resulted in them filing fraudulent forms with the IRS. To date, there have been 15 people throughout the country that have been indicted on federal charges after attending the defendant's seminar. One of those defendants, Douglas Cavanaugh Jr., was charged in the NDNY after attending the defendant's seminar. If released, the defendant would be a danger to the community by being able to continue to infect others with his anti-tax beliefs.

The United States Probation Department, under whose supervision the defendant would be entrusted if released by the Court, would be placed into a dangerous situation attempting to supervise an individual that refuses to provide the Court with any information about his background. During the detention hearing on January 2, 2013, the Court and the defendant engaged in the following conversation regarding the defendant's history:

> **THE COURT:** I mean, I need to know who you are, what's your name, what's your date of birth, how old are you, what's your family, what property do you own, what communities have you resided in, do you have a criminal record, do you have health issues, do you have -- I have no idea who you are.
>
> **THE DEFENDANT:** Okay. Let me quickly address some of that.
>
> **THE COURT:** Yes, please.
>
> **THE DEFENDANT:** All right. You know if I give you residences, then I confess into the limited jurisdiction under special statute. You know that. And I know that. And you know I don't want to, correct? And we both know that everybody's relying upon a driver's license to do that, that thin thread of a document, which, by the way, is under my Maritime lien, it's my security. I could sit here and say, all right, you want equity on those statutes? Where on earth do you have the gall to claim equity for me when you never returned equity on the original deposit? And I could say to this Court I need ya to go back and search out the original deposit. It is -- the cargo shipment was received by the United States July 30, 1951, held in Kings County, it's been verified by Stephen P. Schwartz, City Registrar, City of New York, and find the deposit, confirm that the trust is still in existence until I terminated it and let's balance the accounts. We know. So, it puts me in a very difficult situation....

*See* Exhibit A, page 39 line 9, through page 40 line 10.

During the detention hearing on January 2, 2013, the Court and the defendant engaged in the following conversation regarding the defendant's attempt to challenge the Court's jurisdiction over him:

> **THE DEFENDANT:** And if I were to introduce privately the record of an oath to a foreign state, how would that affect this proceeding?
>
> **THE COURT:** I wouldn't know what that is.
>
> **THE DEFENDANT:** Well, if the entity sitting here had taken an oath to a foreign state, which is an automatic revocation of U.S. citizenship, as you're aware, under, oh, maybe it's Title 8, how would that affect these proceedings?
>
> **THE COURT:** Well, here's the thing: If you're saying that you're revoking the Court's jurisdiction over you, then I can't set any conditions of release, I have no authority then.
>
> **THE DEFENDANT:** But you'd also not be able to set any conditions of remand.
>
> **THE COURT:** Well, at this point in time, you're in the custody of the agents right now, they have taken you to jail, that's where you go.
>
> **THE DEFENDANT:** And how long does that last under circumstances when the Court wants for U.S. citizenship, wants for jurisdiction at the limited jurisdiction? How long -- what's the maximum extent of time -- I am not asking anything tricky.
>
> **THE COURT:** All I'm gonna -- I want to be clear. This Court has jurisdiction to set conditions of release. I identified with you. It seems like I'm bargaining with you, but I'm not. I only will consider conditions of release when you and a financially responsible person signs a bond....

*See* Exhibit A, page 51 line 24, through page 52 line 25.

**5) Risk of Flight if the Defendant were Released**

In addition to arguing that the defendant would present a danger to the community if he were released on conditions, the government also argued that the defendant would be a risk of flight if he were released for the following reasons.

The defendant is a risk of flight because if convicted, the defendant is facing 78-97 months imprisonment. The weight of the evidence is strong and the likelihood of conviction is

high. Therefore, there is an incentive for the defendant to flee to avoid a lengthy term of imprisonment.

The defendant is also a risk of flight because during the federal search warrant that was executed at the defendant's storage unit, agents located 16 books that related to hiding or hiding assets. Some of the titles include, "The DEA Stash and Hide Out Handbook," "How to Disappear in America," "A Coherent Plan for Stress Free, Healthy, and Prosperous Life Without Government Interference, Taxes or Coercion," "Travelers Guide to the Firearms Laws of the 50 States", and "How to be Invisible."

Additionally, the defendant is a risk of flight because after 2006 when the defendant closed CCO, he went underground and attempted to hide his whereabouts. In order to hide where he was living, the defendant utilized the U.S. Mail in a suspicious manner. For example, the defendant rented a PO Box in Clifton Park, New York, while living 200 miles away in Ogdensburg. Rather than receiving mail at his address in Ogdensburg, the defendant's associate (presumably, acting upon the defendant's direction) would pick up his mail at the PO Box in Clifton Park. After approximately two hours, the same man would then come back into the store and forward all the mail obtained from the defendant's PO Box to the defendant's address in Ogdensburg. However, the man did not put the defendant's name on the package. Instead, the defendant addressed the mail to "MAM." The Officer in Charge at the Ogdensburg Post Office had reported the defendant's address to postal inspectors as being "suspicious" because all the mailings received at that address had the same mailing and return addresses.

Moreover, after being scammed out of $200,000.00 by the defendant,WO hired a lawyer to sue the defendant. However, because the defendant had gone underground, WO was unable to locate him.

The defendant did everything he could to hide his whereabouts and to make Glenn R. Unger disappear. At the time of his arrest, he told the agents that Glenn Unger was deceased and that he is now "grantor to the estate" and that his "identity was a 1922 silver dollar coin." There was no record of the defendant living at his address in Ogdensburg: he never changed the address on his driver's license, he didn't own the property, he had no credit cards listing that address, he didn't have a home phone, he used throw away cell phones, and he had no vehicle registered to that address. During his detention hearing, he identified himself as "Glenn Richard" and stated that "Glenn R. Unger" was deceased. *See* Exhibit A, page 11 lines 14-16. At the time of his arrest, the defendant possessed two sovereign citizen identifications which contained the phrase, "Not a U.S. person, resident or subject."

In conclusion, the government agrees with probation that the defendant should be detained and that no condition or combination of conditions could assure the safety of the community and assure the defendant's presence in court at future proceedings if the defendant were to be released.

At the conclusion of the detention hearings, Magistrate Treece issued the following ECF docket text/order: "The Court order Defendant to sign a bond in the amount of $50,000.00 to be secured by US property and a financially secure individual. The Court sets Conditions of Release. The Court questions the Defendant as to the property that may be posted. The Court is requesting a certified copy of the deed, an appraisal and title search of the property before it can be posted as bond. Defendant states he would like to review the conditions and the appearance bond and does not want to sign them at this time. The Court grants Defendant's request to review both before signing. Defendant is remanded." *See* Exhibit B.

The government now requests (1) review and revocation of the Magistrate Court's ECF

text/decision and imminent order for release of the defendant, and (2) detention of the defendant.

## III. Legal Principles

### A. Standard for District Court's Review of Magistrate Court's Release Order

18 U.S.C. § 3145(a) states, in relevant part, that "[i]f a person is ordered released by a magistrate judge...(1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order... The motion shall be determined promptly." *See also*, Rule 58.1(a)(3) of the Local Rules of Criminal Procedure. Local Rule 58.1(a)(3) also states that "Upon filing of any such motion, the opposing party shall file its papers in opposition to said motion within fourteen (14) days of the filing date of said motion. The Court shall promptly determine the motion based upon the submitted papers without oral argument."

By statute, Magistrate Judges have authority to hear many pretrial matters pending before the court, including pretrial detention hearings. 28 U.S.C. §636(b)(1)(2206). The Second Circuit does not consider a Magistrate Judge's pretrial detention order as final until reviewed by the appropriate District Court. *United States v. Harrison*, 396 F.3d 1280, 1281 (2d Cir. 2005) (citing 18 U.S.C. 3145). The party objecting to the Magistrate Judge's pretrial detention order must file a motion for revocation of the order with the court having original jurisdiction over the offense, in this case the District Court. *Id.*

The Second Circuit Court of Appeals has said that a district court "should not simply defer to the judgment of the magistrate, but reach its own independent conclusion". *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1885). A District Court review of a Magistrate Judge's pretrial detention order involves two examinations. First, the District Court should review the Magistrate Judge's factual findings for clear error. *United States v. El-Hage*, 213 F.3d 74, 79 (2d

Cir. 2000). Second, when reviewing the ultimate issue of whether detention is warranted, the District Court reviews the Magistrate Judge's decision *de novo*. *See United States v. Visconcellos*, No.1:07-CR-226-1 & 13 (N.D.N.Y. November 5, 2007)(Sharpe, DJ), and cases cited therein. While an independent review by the District Court of a Magistrate Judge's order of pretrial release is required under section 3145, an actual evidentiary hearing is not required since it would be unduly burdensome and unnecessary. *United States v. Colombo,* 616 F.Supp 780, *rev'd on other grounds* (E.D.N.Y. 1985). "Absent a finding of good cause supported by an explanation . . . the court will not consider new evidence or arguments not presented to the magistrate judge." *Visconcellos* at page 6.

**B. <u>Standard for Determination as to Detention or Release on Conditions</u>**

A defendant's release is governed by the Bail Reform Act, 18 U.S.C. §§ 3141 et. seq. See also, Fed. R. Cr. P. 46(a). In general, the court must release a defendant on personal recognizance, unsecured bond, or specified conditions, whichever is the least restrictive necessary to assure the defendant's appearance and the safety of others and the community. 18 U.S.C. §§ 3142(a)(1-2),(b), and (c). The court may detain, however, but only under restricted circumstances and after a hearing following carefully delineated procedures. See 18 U.S.C. § 3142(a)(4)(e)(f).

The rules governing the hearing and the ultimate detention decision are well established. The evidence may be introduced by proffer since normal evidentiary rules do not apply. 18 U.S.C. § 3142(f); *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995)*(citing United States v. Salerno,* 481 U.S. 739, 743, 107 S.Ct. 2095, 2099, 95 L.Ed. 2d 697 (1987)). The government bears the burden of proof, by clear and convincing evidence as to dangerousness, and by a preponderance of evidence as to fight. § 3142(f); *Ferranti*, 66 F.3d at 542; *United States v.*

*Chimurenga*, 760 F.2d 400, 405-06 (2d Cir. 1985).  Clear and convincing evidence is more than a preponderance, but means something less than "beyond a reasonable doubt," instead requiring "that the evidence support such a conclusion with a high degree of certainty."  *Chimurenga* at 405 (*quoting Addington v. Texas*, 441 U.S. 418, 431, 99 S.Ct. 1804, 1812, 60 L.Ed. 2d 323 (1979)).

The factors the Court must consider are recited in the statute and include the nature and circumstances of the charged offense, the weight of the evidence, the nature and characteristics of the defendant, the nature and seriousness of the risk to the community, and the risk of flight. 18 U.S.C. § 3142(g); see also, *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985).

As to flight and danger, various factors govern the court's consideration.  In order to detain for flight, the court must determine:  (1) whether the defendant is likely to flee the jurisdiction if released; and (2) whether any release conditions will reasonably guard against the propensity to flee. 18 U.S.C. §3142(e); *United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986).

Regarding dangerousness, the Bail Reform Act is the Congressional expression of concern about a group of dangerous defendants as to whom neither stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community. Accordingly, "[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate." *United States v. Colombo*, 777 F.2d 96, 98-99 (2d Cir. 1985).  Simply prohibiting a defendant from "committing further crimes" is an insufficient condition of release to protect the public from dangerousness.  *Id*. at 100 ; *see also, United States v. Ferranti*, 66 F.3d at 544.

**CONCLUSION**

As detailed above, the government has addressed the nature and circumstances of the charged offenses, the weight of the evidence, the nature and characteristics of the defendant, the nature and seriousness of the risk to the community, and the risk of flight in this case. An analysis of these factors warrants the revocation of Magistrate Treece's release order and the defendant's detention.

Dated: January 14, 2013

RICHARD S. HARTUNIAN
UNITED STATES ATTORNEY

/s/

By:

Ransom P. Reynolds
Assistant U.S. Attorney
Bar Roll Number: 512035