UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | | SENTENCING MEMORANDUM |
| V. | * | 12-CR-579 |
| GLENN R. UNGER | * | Hon. Thomas J. McAvoy |

Glenn R. Unger stands before the Court for sentencing following his conviction after trial of one count of Obstructing and Impeding the Internal Revenue Service, in violation of 26 U.S.C. §7212(a); four counts of False Claim or Refund, in violation of 18 U.S.C. §287; one count of Tax Evasion, in violation of 26 U.S.C. §7201; and one count of Fictitious Obligations, in violation of 18 U.S.C. §514(a)(2).

## **OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT**

Paragraphs 37 and 38 - The defendant objects to the loss amount as set forth in paragraphs 37 and 38. As addressed in greater detail herein, there is no evidence that Mr. Unger actually intended to receive tax refunds, and thereby intend a loss, in the amount of $36,429,952.75 and, accordingly, an increase in the offense level of 28 is incorrect.

Paragraphs 31 and 106 - Paragraph 31 states that Dr. William O'Donnell sustained a loss in the amount of $200,000 as a result of the instant offense. The defendant objects to this conclusion and the restitution set forth in paragraph 106. Dr. O'Donnell does not meet the definition of "victim" as set forth in 18 U.S.C. § 1593 as he was not harmed as a result of the crime in Count 7. Any loss of monies by Dr. O'Donnell was due to an alleged breach of contract by Dr. Unger in his not paying Dr. O'Donnell in full for the orthodontist services he provided to

Dr. Unger's former patients after Dr. O'Donnell took over Dr. Unger's orthodontists practice. This alleged loss to Dr. O'Donnell occurred well before Dr. Unger allegedly sent Dr. O'Donnell the fraudulent promissory note for $200,000. Dr. O'Donnell's inability to cash the fraudulent promissory note did not cause an actual loss to Dr. O'Donnell, but rather any loss was caused previously by Dr. Unger's alleged breach of contract. The alleged breach of contract between Dr. Unger and O'Donnell is a civil matter. Because Dr. Unger's conduct as alleged in Count 7 did not cause the loss to Dr. O'Donnell, Dr. O'Donnell is not a "victim" as defined in 18 U.S.C. § 1593, and, accordingly, it would not be appropriate to order restitution to be paid to Dr. O'Donnell in connection with that count.

## CALCULATING THE LOSS AMOUNT

The main issue at sentencing in this case is what is the correct loss amount for purposes of determining the advisory sentencing range. The United States Probation in the Presentence Investigation Report has determined the loss amount to be $36,429,952.75 and the Total Offense Level to be 28. The defendant objects to the loss amount of $36,429,952.75 and the Total Offense Level of 28. The loss amount for purposes of the guidelines should be the "reasonably foreseeable pecuniary harm" meaning the pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was the potential result of the offense." See U.S.S.G. §2B1.1 Application Note 3(A). There is no evidence in the record that the defendant knew or, under the circumstances, reasonably should have known, that the fraudulent claims for tax refunds that were filed would have actually generated refunds in the amount of $36,313,542.75. See PSR at ¶24. As it became clear during the trial, the fourteen (14)

fraudulent claims for tax refunds allegedly filed by the defendant were so obviously bogus and frivolous that every one of the claims filed were immediately detected by the fraud unit at the IRS. The primary tax scheme that Mr. Unger used was what is referred to as the 1099-Original Issue Discount scheme, where the tax refund claimed a certain amount of earned income and that the same amount was paid out in federal taxes. Mr. Unger actually attached the 1099 form to the returns which was a big red flag because that it never done. The claims were obviously bogus and any person that knew even the basics about filing taxes would know that they would immediately be detected at the IRS as fraudulent. The fraudulent claim filed on March 21, 2008 claimed that Mr. Unger paid Time Warner cable $35,000,150.00, that he also paid the government $35,000,150.00 in tax withholdings and, therefore, he was entitled to a refund in the same amount. Anyone, tax expert or not, would immediately know that this was a bogus claim and that the claim did not have even the remotest chance of causing the IRS to send Mr. Unger a tax refund of over $35 million dollars. Even a fraudulent tax refund claim for $35 million that appeared legitimate, is so preposterously high that it would draw intense scrutiny by the IRS and never get through unless it was truly genuine. Nobody disputes that the tax refund claims submitted by Mr. Unger were obviously bogus on their face. In fact, the government in their Trial Memorandum, Document 45, repeatedly states that the method that Mr. Unger used in filing the fraudulent claims was "nonsensical." It is simply not credible that Mr. Unger knew or, under the circumstances, reasonably should have known, that the IRS issuing a tax refund check to him in the amount of $35,000,150.00, or any of the amounts alleged in Count 1, was the potential result of his submitting obviously bogus documents and returns. Mr. Unger, a former orthodontist, is a highly educated and intelligent individual, who would have known that his

receiving big tax refund checks in return for facially bogus refund claims, *was not a potential result of the offense*. This is especially true as evidenced by the fact that from December 28, 2007 through April 20, 2011, Mr. Unger received no tax refunds for the claims he filed and he was notified by the IRS-FRP (Frivolous Return Program) as early as March and May 2008 that his returns were frivolous and he was being assessed a $5,000 penalty per return.  Why Mr. Unger was submitting these fraudulent tax returns has not been answered, however, there is no evidence in the record or produced during the trial that there was ever any realistic chance of the IRS paying out on any of the fraudulent claims that Mr. Unger filed or that Mr. Unger actually intended to fraudulently receive $36,313,542.75 from the IRS.

In United States v. Joetzki, 952 F.2d 1090 (9th Cir. 1991) the court held that the government had the burden of showing that the defendant "attempted to inflict the loss." Id. At 1096.  Presumably the same showing would be required of the government in the present case. In order to support the loss calculation in the PSR, the government will have to establish by a preponderance of the evidence that the defendant intended to cause a multi-million dollar loss. Nonetheless, "[b]efore the district court may enhance a defendant's sentence based upon intended loss, there must be evidence sufficient to show that (1) the defendant intended the loss, (2) the defendant had the ability to inflict the loss, and (3) the defendant completed all of the acts necessary to cause the loss." United States v. Fleming, 128 F.3d 285 (6th Cir. 1997). In the instant case, there is no evidence that Mr. Unger, an educated and intelligent individual, actually thought that the obviously bogus tax refunds he filed would actually generate a refund to him, especially in such ridiculously large amounts.  Mr. Unger did not have the ability to inflict the loss as the tax refunds he filed were obviously bogus and fraudulent, and as the government has repeatedly

stated, the scheme was "nonsensical." Moreover, Mr. Unger obviously did not complete all of the acts necessary to cause the loss insofar as the tax bogus tax returns he filed were immediately detected by IRS-FRP (Frivolous Return Program) and, due to there obviously bogus appearance, said returns were not capable of generating an actual refund.

Additionally, the Second Circuit and others have held that the intended loss must bear some relationship to economic realty. See United States v. Dutsch, 987 F.2d 878, 886 (2d Cir. 1993) (error to simply total the face value of the bogus checks that were used in a credit card fraud, where each check partially replaced previous ones so that the actual or intended amount of much less); United States v. Santiago, 977 F.2d 517, 514-26 (10th Cir. 1992) (loss in unsuccessful insurance fraud could not exceed sum that the insurance company would have paid, even though defendant filed a much larger fraudulent claim).

In the instant case, there was no evidence or testimony that there was even the remotest possibility that the obviously bogus tax returns filed would result in a tax refund check being dispersed to Mr. Unger. A similar case that was before this Court about two years ago was United States v. Ulloa, Case No. 10-321. In that case Mr. Ulloa was convicted at trial of numerous counts of conspiracy to commit mail fraud. In essence, Mr. Ulloa filed numerous fraudulent liens against various public officials in the amount of $6,746,399,008.62. United States Probation found that the intended loss amount was the total of the fraudulent liens, $6,746,399,008.62, and applied a thirty (30) level adjustment to the Base Offense Level of seven (7) pursuant to U.S.S.G.§2B1.1(b)(1)(P). With a three (3) level enhancement pursuant to U.S.S.G. §3A1.2(a), the Total Offense Level was 40, the Criminal History Category was I, and the resulting advisory guideline range was 292-365 months. The defense argued it was not the

defendant's intention to fraudulently obtain $6,746,399,008.62 but rather, it was his intention to challenge the actions of the credit union, the judge and the police by getting them to the table to redress the wrongs he perceived they perpetrated upon him. In the end, the Court credited the defendant's arguments on the loss amount and found that the defendant Ulloa never intended to actually steal $6,746,399,008.62; but rather, the Court determined the loss amount to be $63,401.81 which was the amount of the legal fees that were incurred by the victims County of Ulster and Mid Hudson Valley Federal Credit Union, which resulted in a Total Offense Level of 16 and an advisory sentencing range of 21 to 27 months. The Court, however, found that Mr. Ulloa's conduct was egregious as it emotionally impacted and devastated the personal lives of the victims against whom he had filed liens, insofar the victims thought they might have to pay large sums of money to Mr. Ulloa and also take a lot of steps to clear their credit records. As a result, the Court found that the sentencing range of 21 to 27 months was not adequate and departed up to offense level 25 with a guideline range of 57 to 71 months.

Although the general nature of the fraudulent scheme that Ulloa engaged in is different [1]from that alleged against Mr. Unger, both cases have one thing in common; neither of the schemes stood the remotest chance of the defendant receiving the preposterously high amounts of money set forth in their documents, nor is it reasonable to conclude that either defendant actually

---

[1] In the instant case, there is no evidence in the record that the IRS or any other governmental agency incurred an actual monetary loss, administrative or otherwise, as a result of the claims filed by Mr. Unger. Additionally, unlike in Mr. Ulloa's case, Mr. Unger filed his tax refund claims with the IRS as a governmental institution, and not against any individuals personally other than the tendering of the Secured Promissory Note to Mr. O'Donnell. Unlike in Mr. Ulloa's case, there is no testimony or evidence in this case that any individuals at the IRS were personally targeted by Mr. Unger or that any of the IRS employees were in anyway emotionally or otherwise harmed or impacted.

thought that their receiving the preposterously high amounts of money *was a potential result of the offense*.  While some of the amounts in Mr. Unger's tax refund claims were smaller, the fraudulent claim for $35,000,150.00 is what really drives the high numbers in this case; but whether the amount claimed was $35,000,150.00, $285,973.90, or $5,761.59, they are all part of the same "nonsensical" scheme that had zero chance of succeeding.  The fact is, in the instant case, as in Ulloa, the claims/liens filed were so obviously fraudulent that the payment and loss of large sums of money never was *a potential result of the offense*.  Accordingly, the defendant objects to the tax loss amount of $36,429,952.75 as set forth in ¶38 of the PSR.

  The loss figure of $36,429,952.75 also includes the $116,410.43 attributable to the tax evasion conduct.  See PSR ¶27.  It is unclear how the government and, thus, probation arrived at the loss figure of $116,410.43.  It is purportedly comprised of Mr. Unger's tax liabilities for the years 2005 and 2006 and his frivolous filing penalties for the 2004 through 2008 calendar years, (see PSR ¶7), but there is no break down of the amounts for tax liabilities versus frivolous filing penalties.  In the U.S.S.G. §2B1.1, Application Note 3(D) <u>Exclusions from Loss</u>, it states "Loss shall not include the following: (I) Interest of any kind, finance charges, *late fees, penalties*, amounts based on an agreed-upon return or rate of return, or of similar costs. [Emphasis added] It would seem then that any frivolous filing penalties or late fees could not be included for loss purposes in Count 6, but the frivolous filing penalties or late fees are not separated out, so there does not seem to be sufficient information as to what portion of the loss figure of $116,410.43 is actual tax liabilities versus frivolous filing penalties.  Accordingly, without knowing how the $116,410.43 breaks down, the entire amount should be deleted from the loss amount and the defendant would object to any portion of that figure being counted as loss.

Probation has also asserted that for the Fictitious Obligation charge in Count 7, the loss amount is $200,000, resulting in a base offense level of 7 and an increase of 10 pursuant to U.S.S.G. §2B1.1(b)(1)(F). Probation asserts that the Adjusted Offense Level of 28 for Counts 1 through 6 is higher and, therefore, controls. Nevertheless, the defendant objects to the loss amount of $200,000 for Count 7. The document involved in Count 7 purports to be a Secured Promissory Note in the amount of $200,000 drawn on the US Secretary of Treasury and payable to William O'Donnell as a fiduciary trustee of the note. Mr. Unger allegedly sent the note to William O'Donnell in payment for monies owed to O'Donnell for orthodontist work performed on Mr. Unger's prior patients. Mr. O'Donnell attempted to deposit the note at the bank, but the note was quickly recognized by the bank as being fraudulent and worthless. The note was never cashed and no monies were ever lost by anyone in connection with this note. The note itself is facially bogus to anyone that knows anything about commercial instruments such as bank personnel, and upon being deposited at the bank it was immediately questioned by the first bank official to see it. That bank officer then inquired of a bank supervisor who quickly concluded that it was fraudulent. Again, this appears to be an obviously bogus document that really had no chance of being cashed and the defendant would object to any portion of that figure being counted as loss.

Based on the overall circumstances of this case and the arguments above, it is not realistic to conclude that Mr. Unger knew or, under the circumstances, reasonably should have known, that the fraudulent claims for tax refunds that were filed would have actually generated refunds in the amount of $36,313,542.75, and that he had subjective intent to enrich himself of over $35 million dollars. This is borne out by the "nonsensical," and obviously bogus method Mr. Unger

employed in filing the false tax returns, and the several exorbitant dollar amounts that were sought.  Mr. Unger walked away from an established and lucrative orthodontist practice, and it makes little sense that he was trying to make a quick grab from the IRS of $35 million and then ride off into the sunset a wealthy man.  There are those scam artists in society whose avarice and quest for great wealth are unquestioned, and whose lifestyle is consistent with that; Bernie Madoff being a perfect example.  There is no indication that Glenn Unger falls into this category.

The government has asked for a sentence at the high end of the sentencing guidelines based on the fact that Mr. Unger held seminars that taught others how to make false claims against the United States and, therefore, the true financial harm caused by the defendant is greater than that proven at trial.  This argument should be rejected.  Mr. Unger has never been charged in the instant case or any other case with any conduct related to these seminars.  Moreover, there was no evidence adduced at the trial or currently in the record of this case that as a result of Mr. Unger's promotion of tax fraud schemes, the IRS received millions of dollars of false claims and paid out some of the false claims by refund checks of several hundred thousand dollars.  There was no evidence of this introduced during the trial, nor is there evidence of this contained within the Presentence Investigation Report.  Therefore, we object to the government's requesting that the Court impose a sentence based on evidence that is not in the record.

The government also argues that Mr. Unger caused non-financial harm by subjecting others to criminal liability for their implementation of the schemes he promoted.  Mr. Unger is not charged with conspiracy, and there is no evidence in the record that Mr. Unger caused non-financial harm to anyone; even if there was, Mr. Unger's sentence should not be based on the criminal conduct of others.  Lastly, the government further argues that Mr. Unger subjected

9

innocent individuals and businesses to the increased likelihood of IRS scrutiny and audit by using the 1099-OID forms with the names of various individuals and businesses. This argument also doesn't hold water. The government presented numerous witnesses whose names and/businesses were on the 1099-OID forms. Not one of those witnesses testified that they or their businesses were subjected to greater scrutiny by the IRS, or that they were negatively impacted in any way by the defendant's use of their name or business on the 1099-OID form.

## LOSS AMOUNT OVERSTATES THE SERIOUSNESS OF THE OFFENSE AND WARRANTS A BELOW GUIDELINE SENTENCE

U.S.S.G. § 2B1.1, Note 19 (C) provides that "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such case a downward departure may be warranted." In the instant case, it is at the very least highly questionable that Mr. Unger intended to cause a loss of over $35 million dollar. For the sake of argument, however, if the Court were to find that the loss amount is $36,429,952.75, then due to the circumstances of this case as set forth herein, the defendant submits that such a loss over represents the seriousness of the offense insofar as it is highly doubtful that Mr. Unger intended either a loss or personal gain in said amount.

In light of this, we would respectfully request that the Court impose a less severe non-guideline sentence in light of the fact that the overall circumstances of this case are inconsistent with Mr. Unger intending to cause a loss of or enrich himself in the amount of $36,429,952.75. It is well established in the Courts that the defendant's motive for committing the offense is one important factor. In <u>United States v. Ranum</u>, 353 F.Supp. 2d 984 (E.D. Wis. 2005) where a bank

officer was convicted of defrauding a bank, the Court imposed a sentence of a year and a day where the advisory guideline range was 37-46 months, in part because the defendant did not act for personal gain or for improper personal gain of another . In explaining its decision, the Court found the offense was serious, but found, however, that the

> "defendant's culpability was mitigated in that he did not act for personal gain or for improper personal gain of another. Under § 3553(a) and the decisions of the Supreme Court, a sentencing court may properly consider a defendant's motive....One of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between the loss and offense level.  For example, the guidelines treat a person who steals $100,000 to finance of lavish lifestyle the same as someone who steals the same amount to pay for an operation for a sick child.  But from the standpoint of personal culpability, there is a significance difference."

In imposing the lesser sentence, the court in <u>Ranum</u> stated that it considered the history and character of the defendant, that he was fifty years old, had no prior record, a solid employment history and was a devoted family man who did an excellent job of raising his daughters. Similarly, in the instant case, Mr. Unger is 62 years old, has no prior record, a solid employment history, and was a dedicated medical professional for over three decades.

The court in <u>United States v. Emmenegger</u>, 329 F.Supp.2d 416 (S.D.N.Y. 2004), imposed a non-guideline sentence, stated,

> "The Guidelines place undue weight on the amount of loss involved in the fraud...the guidelines provisions for theft and fraud place excessive weight on the single factor, attempting - no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes to assign precise weights to the theft of different dollar amounts.  In many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense of the need for deterrence.  To a considerable extent, the amount of loss caused by this crime is a kind of accident, dependent as much on the diligence of the victim's security procedures as on Emmenegger's cupidity...Were less emphasis placed on the overly-rigid loss table, the identification of different types of fraud of theft offenses of greater or lesser moral culpability or danger to society would perhaps assume greater significance in assessing the seriousness of different frauds." Supra at 427.

In the instant offense, as in <u>Emmenegger</u>, the amounts in the tax returns is a relatively weak indicator of the moral seriousness of the offense and the need for deterrence. No loss was sustained, and the overall circumstances of the case strongly suggest that no such loss was intended. The case law and any sense of judicial fairness speak loudly for a non-guideline sentence in this case.

In <u>United States v. Broderson</u>, 67 F.3d 452 (2d Cir. 1995), the court departed seven levels because the defendant did not profit personally, contracts were favorable to the government, and "calculated loss significantly ..overstated the seriousness of the defendant's conduct."

In <u>United States v. Milne</u>, 384 F. Supp. 2d 1309 (E.D.Wis. 2005), a bank fraud case where the Guidelines were 18 to 24 months, the court imposed 6 months jail and 6 months home confinement for various reasons noting that "with almost singular focus on loss amount, the Guidelines sometimes are insufficiently sensitive to personal culpability."

## **MR. UNGER'S DIMINISHED MENTAL CAPACITY WARRANTS A DOWNWARD DEPARTURE**

Mr. Unger underwent a psychological competency evaluation in June 2013. He was found to be competent to stand trial and to assist counsel with his defense. Notwithstanding, there clearly appears to be some mental health issues at play, and contrary to the competency evaluation findings, Mr. Unger was unable and/or unwilling to assist counsel at all in his defense. The psychologist that did the evaluation apparently did not speak with any people who know Mr. Unger best. Had the psychologists spoken to Ronnie Unger as counsel did, they would have learned a great deal about Mr. Unger's background and about the dramatic changes in Mr. Unger's

personality and mental state over the years. Ronnie Unger's letter to the Court supports the idea that Mr. Unger was suffering from a mental disease that contributed to his conduct in this case. Counsel engaged a professional Jacklyn Bashkoff, Ph.D. to perform a psychological evaluation of Mr. Unger, but of course that cannot happen without Mr. Unger's cooperation. Based on information provided by counsel and the conversation Mr. Unger recently had with his sister Ronnie, Dr. Bashkoff has opined that Mr. Unger likely suffers from a delusional disorder, and more specifically, delusions of grandeur. That diagnosis would be consistent with Mr. Unger's focus on religion during the psychological evaluation and his statements to Ronnie Unger in June 2013 about being a Messiah and changing peoples' lives. The Court has also had the opportunity to observe Mr. Unger in court on several occasions and saw Mr. Unger conduct himself in what could be described as abnormal and mentally unstable behavior.

  U.S.S.G. §5K2.13 states a downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. The extent of any departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." The phrase "significantly reduced mental capacity" is defined to mean that the defendant had a "significantly impaired ability" either to "understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason" or to control behavior that the defendant knows is wrongful." Se §5K2.13, comment (n.1) The defendant seeking the §5K2.13 departure must establish two elements: "reduced mental capacity" and "a causal link between the reduced capacity and the commission of the charged offense." United States v. Prescott, 920 F.2d 139, 146 (2d Cir.1990). A downward departure

from the Sentencing Guidelines based on diminished capacity does not depend upon establishing that "but-for" the diminished capacity the crime would not have been committed.  It is sufficient that the diminished capacity is a contributing factor to the commission of the offense.  See United States v. Ruklick, 919 F.2d 95, 97 (8th Cir. 1990).

   Although it is difficult to say for sure when Mr. Unger's diminished capacity began, the government's evidence alleged that he failed to file tax returns for tax years 2005 and 2006, he began drawing down on his retirement accounts in 2005-2006, and walked away from his lucrative orthodontist practice in 2006.  He then allegedly began filing the false tax returns in 2007 and did so through 2011.  Thus, it would appear that Mr. Unger's mental state had changed to the point of being "diminished" by 2005-2006, and thus contributed to filing the fraudulent tax returns and other documents beginning in 2007.  The change in Mr. Unger's mental state around that time to the point of having a "diminished capacity" is a very plausible explanation for the dramatic changes in the way he conducted himself as outlined above.  In fact, it is difficult to reconcile Mr. Unger's dramatic changes in behavior beginning in about 2005 without Mr. Unger having undergone a significantly altered mental state to the point of diminished capacity.  Accordingly, we respectfully submit that Mr. Unger suffered from a diminished capacity that contributed to his committing the instant offense, and that his diminished capacity warrants a downward departure in the sentencing guidelines.

## THE §3553 FACTORS WARRANT A SIGNIFICANTLY

## REDUCED NON-GUIDELINE SENTENCE

### HISTORY AND CHARACTERISTICS OF THE DEFENDANT

As indicated in the Presentence Investigation Report, Mr. Unger is 61 years old. He was raised in Brooklyn, NY. Mr. Unger grew up in a loving family with 'traditional values.' Mr. Unger was from all accounts very close to both of his parents. His father was a jeweler, his mother was a homemaker. Both of his parents are deceased and he has one sister, Ronnie Unger, who resides in the state of Florida. Attached is the letter of Ms. Unger. She and Glenn, her only sibling, were extremely close growing up. As a kid, Glenn was literally a mensa genius, and in addition to being brilliant, he was an incredibly talented dancer, singer and actor as well. As children and young teens, Ronnie and Glenn were in show business in New York City. They sang, danced and acted on and off Broadway, in television and film. For instance, as a child Glenn played the role of "Winthrop" in the Broadway musical "Music Man" starring Robert Preston. In another show on Broadway that was a tribute to Fred Astaire, Glenn at about age 10 played Fred Astaire as a boy and Ronnie played Fred Astaire's sister Adele. Fred Astaire and Adele were in the audience and after the show Fred Astaire met Glenn and told him that Glenn was a better dancer at age 10 than he was. Glenn and his sister performed in many different venues including the numerous resorts in the Catskill mountain area. (Attached are a few pictures of Glenn and Ronnie as child performers)

As Ronnie indicates, Glenn was always a star student and excelled in everything he did. He was a perfectionist in everything he did. He attended Brooklyn College where he received

15

many accolades for his work and ideas and went on to graduate second in his class from the University of Buffalo School of Dentistry in 1976. He was a vibrant, passionate and vital person, with unbounded compassion for everyone and always gave of himself to the needy. Glenn was an enormously successful orthodontist and believed very much in making his orthodontist services affordable for those families that struggled financially. Attached is a newspaper article that appears to be from July-August 1998 announcing the opening of Dr. Unger's orthodontist practice in Columbia County. When interviewed about opening his practice, Dr. Unger stated, "Since 1978 when I first started practicing, the most difficult part of being an orthodontist has been watching needy children go untreated due to financial obstacles." Dr. Unger went on in the article to announce his 'Revolution 1 Plan,' which consisted of eliminating the down payment for orthodontic services and lowering monthly payments by extending payment plans beyond the traditional two years. Dr. Unger also announced that he would be open on Saturdays so that parents would not have to leave work to drive their kids to the orthodontist each month. It is clear from the article that Dr. Unger was a very caring and truly dedicated dental health care professional for many years.

    Glenn had a very close relationship with his father and his father's death in 1975 shook Glenn to his core. Ronnie said that Glenn's mother passed away suddenly in June 2007. When Ronnie called and told Glenn of their mother's death, Glenn's mental state seemed to be such that he was unable to grasp what Ronnie was telling him. Ronnie indicates Mr. Unger has been mentally unbalanced for years. Ronnie last spoke with Glenn when he called her while he was in Manhattan last year undergoing his competency evaluation. Glenn talked mainly about God and religion, being a Messiah and changing peoples' lives. Having known Glenn all her life, Ronnie

knows that he is mentally ill and needs help. She urged him to get psychiatric help, but to no avail. Ronnie is aware that Glenn was deemed competent to stand trial, and she explained that Glenn is so smart that he could fool anyone. As Ronnie states, there is not one professional that has gotten past his intelligence and gift to gab.

The Court does not have as much personal information about Mr. Unger as it has in most cases. We do know, however, that Mr. Unger is 62 years old, and prior to this case had never incurred a single arrest. Mr. Unger is well educated, intelligent, and through his years of being a successful and compassionate orthodontist, he has helped hundreds if not thousands of children, teenagers and adults. Mr. Unger's steady professional employment history is a basis in and of itself for a departure pursuant to U.S.S.G. §5H1.5. Why Mr. Unger left orthodontia and took a different path in life is uncertain; what is certain, however, is that Glenn Unger for his entire life conducted himself as a good and law abiding citizen, and through his profession as an orthodontist made an immeasurable difference in the lives of so many people. We all would like to think that we have made a positive contribution to society and to mankind before we leave this earth. Notwithstanding whatever Glenn Unger did in the instant case, he has already made that positive contribution to mankind many times over, and that should count for a lot in deciding what the appropriate sentence is in this case.

Mr. Unger has been incarcerated since his arrest on December 29, 2012, which will be over 16 months at the time of sentencing, which would be the equivalent of serving a 19 month sentence with good time credit. In light of the above, we respectfully submit that no additional period of incarceration is necessary to serve the goals of sentencing and respectfully request that the Court impose a sentence of time served.

Date: April 8, 2014

                LISA PEEBLES
                Federal Public Defender

By    /s/George E. Baird, Jr.
        George E. Baird, Jr.
        Bar # 506247
        Assistant Federal Public Defender
        39 North Pearl Street
        Albany, New York 12207

<u>Certificate of Delivery</u>

I certify that I have delivered a copy of the foregoing pleading to the Clerk of the Court and to Assistant United States Attorney Ransom Reynolds, Esq., via ECF.

                */s/ George E. Baird, Jr.*
                George E. Baird, Jr.